COPY

1  Philip J. Layfield (California State Bar No. 204836)
2  **Philip J. Layfield, Attorney at Law**
   100 Wilshire Blvd, Suite 950
3  Santa Monica, CA 90401
   Telephone (310) 956-1497
4  Facsimile (800) 644-9861
   Email: philip@pjllawfirm.com

5  Attorney for Plaintiff, Total Access Payments, Inc.

6              UNITED STATES DISTRICT COURT

7          FOR THE CENTRAL DISTRICT OF CALIFORNIA

8

9  TOTAL ACCESS PAYMENTS, INC., a          )   Case No.: CV 10 5475-GHK-RC
10 Delaware Corporation                     )
                                            )   First Amended Complaint For:
11            Plaintiffs,                    )
        vs.                                  )   1. Violations of 18 U.S.C. § 1962(c) and
12                                           )      Civil RICO and Conspiracy to Commit
13 Maximum Business Innovations, Inc., a     )      Civil RICO;
   Colorado Corporation, Commercial Escrow   )   2. Conversion;
14 Services, Inc., a California Corporation, Eagle )   3. Breach of Fiduciary Duty;
   Ledge Capital, LLC a California Limited    )   4. Professional Negligence;
15 Liability Company, Dakota Holdings, Inc. a )   5. Securities Fraud;
16 California Corporation, Antoinette Hardstone,)   6. Fraud;
   an individual, Kevin McBride, an individual,)   7. To Set Aside Fraudulent Conveyances;
17 Timothy P. Gates, an individual, Matthew   )   8. Unfair Business Practices;
18 Anderson, an individual, Claudia Lopez, an )   9. Unjust Enrichment;
   individual, Maxwell A. Wyatt, an individual,)   10. False and Misleading Advertising;
19 Scott Shepard, an individual, Gene Houston,)   11. Failure to Supervise
   an individual, Rhett Landon Shepard, an     )
20 individual, Michael S. Roddy, an individual,)       **(JURY TRIAL DEMANDED)**
   and DOES 1- 10 INCLUSIVE                    )
21                                            )
22            Defendants.                     )
                                             )
23 ─────────────────────────────────

24 COMES NOW, Plaintiffs, and allege as follows:

25                    **NATURE OF THE ACTION**

26

27     1. Plaintiffs bring this action against this group of companies and individuals, who,

28 through intentional misrepresentations and failures to disclose material facts, including material

conflicts of interest, an undisclosed financial interest in the transactions, caused and advised Plaintiffs to direct approximately one million dollars ($1,000,000) to be wired into an escrow account at a related escrow company with the expectation that Plaintiff would receive proceeds of over one hundred forty three million ("$143,000,000.00) through a complex web of financial transactions. Despite being hired to represent Plaintiff as a ("Funder"), this gang of criminals embarked on an elaborate scheme to steal Plaintiff's funds while attempting continue to perpetrate additional frauds.  Now that the money has disappeared, the collective gang is attempting to lay blame with Defendants Timothy P. Gates and Matthew Andersen of the Temecula/Murrieta area which only seems plausible due to Gates' previous allegations of fraud against him in connection with the dismantling of a multi-million scheme involving investment partnerships in 2007.  To make matters more suspicious, Timothy P. Gates is hiding out in a trailer in the Inland Empire despite having numerous accounts at HSBC Bank, N.A. with substantial sums of money.

2.   Curiously enough, although the gang previously highlighted all of their qualifications on their various websites, shortly after the money disappeared, they removed all of their personal names and information from public view.  Additionally, the individual officers listed on the website of Maximum Business Innovations, Inc.("MBI") now claim that they were never officers and Maxwell A. Wyatt, by and through his attorney claim he was not in fact the Chief Financial Officer Of and has no idea why he was on the MBI  website.

<u>JURISDICTION AND VENUE</u>

3.   This Federal District Court may exercise jurisdiction over this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") codified as Chapter 96 of Title 18 of the United States Code (18 U.S.C. §1961-1968), violations of Section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. §78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, 15 U.S.C. § 1116 and 1121 for violations of Section 43(a) of the Lanham Act, and supplemental jurisdiction pursuant to 28 U.S.C. §1367 for conversion, breach of fiduciary duty, professional negligence, fraud, unjust enrichment and other related causes of action

4.   This Court has personal jurisdiction over the Defendants because they either conducted business in California, were fiduciaries or recipients of funds held in trusts or escrows for Californians, or participated in a criminal enterprise which injured Californians.

5.   Venue is proper in this Court because the funds sought to be recovered are on deposit with HSBC USA, N.A., UnionBanCal Corporation or their affiliates and they have a principal place of business located in this jurisdiction.

## THE PARTIES

The Plaintiffs

6.   Plaintiff Total Access Payments, Inc. (hereinafter "TAP") is a Delaware corporation located at 20783 N. 83rd Avenue, Suite 103-244, Peoria, Arizona 85382.

The Defendants

7.   Defendant, Eagle Ledge Capital, LLC ("ELC") is a California limited liability company and registered as a broker/dealer by the Securities and Exchange Commission and the employing broker of Maxwell A. Wyatt.

MBI Defendants

8.   Defendant, Maximum Business Innovations, Inc. ("MBI") is a formerly defunct Colorado corporation, brought back to life in 1998 by Kevin McBride whose principal place of business is located at 620 Newport Center Drive, Suite 1100, Newport Beach, California 92660.

9.   Defendant, Kevin McBride, is an individual residing in the State of California and Chief Executive Officer of MBI and "Celebration Associate" at Rockharbor Church.

10.  Defendant, Gene Houston, is an individual residing in the State of California and President of MBI.

11.  Defendant, Maxwell A. Wyatt, is an individual residing in the State of California, Chief Financial Officer of MBI and is an SEC Registered Representative who is either currently employed by or previously employed by Eagle Ledge Capital, LLC.

12.  Defendant, Michael S. Roddy, is an individual residing in the State of California and licensed as a Real Estate Salesperson by the State of California.

13.  Defendant, Scott Anthony Shepard, is an individual residing in the State of California and licensed as a Real Estate Salesperson by the State of California.

Dakota Defendants

14.  Defendant Dakota Holdings, Inc. ("DHI") is a California corporation whose principal place of business is located at 2901 West Coast Highway, Newport Beach, CA 92663.

15.  Defendant, Timothy P. Gates, is an individual residing in the State of California and former owner of Gates & Haas, LLC who lives with his girlfriend Angela Shaw in a trailer in Romoland, California.

16.  Defendant, Matthew Anderson is an individual residing in the State of California and business partner of Co-Defendants Timothy P. Gates and Rhett Landon Shepard.

17.  Defendant, Rhett Landon Shepard is an individual residing in the State of California, and licensed as a Real Estate Salesperson by the State of California.

18.  Defendant, Claudia Lopez is an individual residing in the State of California, the girlfriend of Matthew Anderson and recipient and beneficiary of the stolen funds.

Escrow Defendants

19.  Defendant, Commercial Escrow Services, Inc. ("CES") is a California corporation licensed as an "Escrow Agent" by the State of California whose principal place of business is located at 3478 Buskirk Avenue, Suite 242, Pleasant Hill, CA 94523.

20.  Defendant, Antoinette Hardstone, is a principal of CES and in individual residing in the State of California.

## GENERAL ALLEGATIONS

21.  On our about 2008, the individual MBI Defendants devised a scheme to take control of a defunct Colorado corporation and revive it for the sole purpose of misleading potential investors into believing that they had been in business for over 10 years as MBI.

22.  Using his "Church" connections Kevin McBride, assembled a team of con artists to begin pitching a bogus transaction regarding fake financial instruments with the intent of stealing investor monies. The MBI Defendants claimed to have superior knowledge and experience involving the purchase and monetization of various financial instruments as a ploy to induce investors to hire them as a source of funding.  To date, the Thief Defendants have never successfully completed one of these purported "Monetization" transactions.  In fact, every investor that has placed money on deposit with the MBI Defendants has lost all of their money.

23.  To further the scheme, the MBI Defendants developed a sophisticated website to advertise their services and their qualifications.  Most notably, they listed their Chief Financial Officer as a seasoned financial executive licensed to offer Securities by the Securities and Exchange Commission.  In fact shortly after the first group of money disappeared and was distributed to the MBI Defendants, Maxwell A. Wyatt joined ELC as a registered representative at the time when he was also listed as the Chief Financial Officer of MBI.

24.  ELC knew or should have known of Maxwell A. Wyatt's position as the Chief Financial Officer of an unlicensed broker/dealer offering fraudulent securities and failed to properly supervise Maxwell A. Wyatt to prevent further harm to prospective investors.

25.   On or about November 2010, (The MBI Defendants) approached TAP and claimed to be able to provide funding through the use of a complicated ("Monetization Transaction"). Despite not being a broker/dealer authorized to engage in such transaction MBI, by and through their Chief Financial Officer, who is a FINRA registered representative (CRD# 4791317) with the requisite knowledge of the laws he was breaking embarked on an elaborate scheme to steal $1 million from TAP.

26. Even though Maxwell A. Wyatt did not join ELC until after the initial investment money was deposited, the MBI Defendants continued to engage in fraudulent conduct by attempting to convince TAP to enter into additional "funding" agreements in February of 2010 and continued to make false and misleading statements regarding the status of their investment all in an attempt to buy time to further disperse the stolen funds and hide them in offshore accounts.  This all occurred while Maxwell A. Wyatt was employed by ELC and ELC failed to take the steps necessary to prevent further fraud from occurring.  In fact, had ELC properly supervised Mr. Wyatt, TAP would have more quickly discovered the fraud and could have prevented further conversions of their funds.

27.  MBI convinced TAP to enter into a "Funding Agreement" dated December 29, 2009. This "Funding Agreement" required TAP's delivery of $1 million upfront as funding fees. CES was the escrow agent listed and chosen by MBI to receive and protect TAP's money.

28. MBI and CES had a pre-existing relationship with the other Defendants and worked in concert with each other to convert TAP's $1 million.

FIRST AMENDED COMPLAINT                6            Case No.   CV 10-5475-GHK-RC

29. TAP's money was deposited with CES pursuant to certain escrow instructions designed to insure that TAP's money would not be released unless certain conditions were satisfied.

30. CES was charged to hold TAP's escrow pursuant to specific terms and MBI was contractually obligated not to allow the release of the escrowed funds without TAP's express written consent and not without verifying the validity of the financial instrument to be purchased and not without verifying that the financial instrument was in compliance with the terms of the Funding Agreement.

31.  Rather than comply with their contractual provisions, the MBI Defendants conspired with the Dakota Defendants and the Escrow Defendants to illegally break the escrow and wire the funds out of escrow.

32.  The Dakota Defendants produced a fraudulent piece of paper that they in fact forged in furtherance of this scheme to allow the MBI Defendants and the Escrow Defendants to illegally release the Escrowed Funds.

33.  The Dakota Defendants knew the instrument was false, the MBI Defendants knew the instrument was either false or did not comply with the Escrow Instructions and the Escrow Defendants knew or should have known that the instrument was false and did not comply with the Escrow Instructions.

34. CES blatantly and willfully ignored the terms of the Escrow Agreement and released the monies to the other Defendants.  Not only did CES release the escrowed funds pursuant to a fraudulent instrument being presented, CES failed to verify the validity of the instrument as required by the "Escrow Agreement," the instrument was not in compliance with

the "Escrow Agreement," and the monies were released after the deadline for satisfaction of the Escrowed Terms had passed.

35.  CES was required to return the Escrowed Funds to TAP after the expiration date, but instead chose to ignore those specific deadlines by delivering the escrowed funds to the other Defendants instead of returning the funds to TAP.

36.  CES illegally broke escrow and release a portion of the funds to the Dakota Defendants and a portion of the funds to the MBI Defendants.

37.  Despite claiming they never received any proceeds from the subject transactions, as it turns out, MBI was wired at least forty thousand dollars ($40,000).  Within days of MBI receiving the TAP money from CES, the individual MBI Defendants caused money orders to be issued to themselves as compensation for the successful completion of a fraudulent transaction.

38.  Within days of the Dakota Defendants receiving TAPs money, they began to disperse the funds to various international bank accounts to hide the money.

39.  Within days of receiving the TAP money, Matthew Anderson purchased himself a brand new Range Rover.

40.  Within days of receiving the TAP money, Matthew Anderson purchased real estate and other assets in the name of his girlfriend and co-defendant Claudia Lopez.

41.  Claudia Lopez was aware that funds and property received from Matthew Anderson were obtained illegally.

42.  Claudia Lopez contributed to the fraudulent scheme by supplying Matthew Anderson with a "blocked" cellular telephone to conduct business and assisted in hiding assets.

43. The MBI Defendants now claim that TAP's money as just "disappeared" while the Dakota Defendants continue to claim the transaction is legitimate and that TAP will receive their monies shortly.

44. On May 6, 2010, Thomas Hess, Esq. counsel for TAP filed a formal complaint with the Special Administrator of Escrow Agents (California). A complete summary of the transaction, partiesand documents at issue herein is attached herewith as Exhibit "A."

### FIRST CAUSE OF ACTION

### Violations of 18 U.S.C. § 1962(c) and (d); Civil RICO and Conspiracy to Commit Civil RICO

### Against MBI Defendants, Dakota Defendants and Escrow Defendants

45. Plaintiffs incorporate paragraphs 1 through 45 above as if fully set forth herein.

46. The MBI Defendants, Dakota Defendants, and the Escrow Defendants collectively referred to in this First Cause of Action (and elsewhere) as the "RICO Defendants." The RICO Defendants are all persons within the meaning of 18 U.S.C. § 1961(3), and are the persons involved in the creation and maintenance of a racketeering enterprise as defined in §1961(4). The RICO Defendants, and each of them, have been employed by and/or associated with the enterprise, and while so employed and/or associated, have conducted, directed, managed or participated in, either directly or indirectly, the conduct of the affairs and business of the enterprise affecting interstate commerce through the described pattern of racketeering activity.

**A. The Scheme**

47. The scheme was to gain access to the **Funds** of Plaintiff's clients held in escrow, steal the escrow funds, and conceal the theft through corporate machinations and a complex web of entity transfers. The success of the scheme was dependent upon the RICO Defendants' ability

to mislead Plaintiff regarding the safekeeping and use of their funds and to hide the ever worsening financial condition of the RICO Defendants.  The scheme appears to have failed since no additional client funds have been gathered to repay Plaintiffs.

**B. The RICO Enterprise**

48.   The enterprise is a group of persons and entities associated together for a common purpose of engaging in a course of conduct. The enterprise consisted of the RICO Defendants identified above. Each person employed by or associated with the enterprise had separate identities from the enterprise itself. Each person associated with the enterprise managed and directed specific components of the enterprise, each component being critical to the success of the enterprise. However, if one member left the enterprise, it would continue as an ongoing criminal enterprise until stopped by law enforcement.

49.   The enterprise operated out of, among other places, a suite of offices located in California, but conducted its affairs in various locations throughout the United States by using, and effecting, interstate commerce. At all times herein mentioned, the RICO Defendants operated as an "enterprise" as defined in 18 U.S.C. § 1961(4).

**C. The Pattern of Racketeering**

50.  In furtherance of the ongoing scheme, the RICO Defendants, and each of them, committed hundreds of predicate acts proscribed by 18. U.S.C. § 1961(1)(b). These acts occurred between November 2009 and July  2010, and included mail fraud, wire fraud, and money laundering.

**D. Injury to Business or Property**

51.  As the actual and proximate cause of the operation of the enterprise, the RICO Defendants' association with the enterprise, and the RICO Defendants' conducting the affairs of

the enterprise through the pattern of racketeering activity and commission of predicate acts, Plaintiffs have been damaged in amounts to be shown at trial, including but not limited to, the loss of their trust res which was a business asset for each of them. Plaintiffs are entitled to treble damages against the RICO Defendants.

## SECOND CAUSE OF ACTION

### Conversion
### Against MBI Defendants, Dakota Defendants and Escrow Defendants

52.   Plaintiffs incorporate paragraphs 1 through 51 above as if fully set forth herein.

53.   Plaintiffs had **funds** on deposit with the Escrow Defendants. Plaintiffs retained a superior possessory interest in their respective **funds** and retained the right to possession of those **funds** if a proper transaction was not approved or if the escrow expired and required the funds to be returned to Plaintiff.

54.   The MBI Defendants misappropriated and converted the **funds** held by CES to the detriment of Plaintiffs in an amount to be proven at trial.

55.   Neither Plaintiffs any agent of Plaintiffs consented to the misappropriation and conversion of their **funds** and such conduct was a substantial factor in causing damages and harm to Plaintiffs, including the loss of the trust res, and the need to hire and retain professionals to mitigate losses caused by the theft.

56.     The herein described misappropriation and conversion was done with wrongful intent, and the MBI Defendants, Dakota Defendants and Escrow Defendants are guilty of oppression, fraud and malice toward the Plaintiffs whereby the Court should impose a penalty on said Defendants to make an example of them to deter others from such behavior in the future.

57.  As the actual and proximate cause of the conversion, Plaintiffs have lost their **Funds** totaling over $1,000,000 and have lost business opportunities in amounts to be established at trial.

### THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty
### Against MBI Defendants and Escrow Defendants

58.  Plaintiffs incorporate the allegations of paragraphs 1 through 57 as though fully set forth herein.

59.  The MBI Defendants and the Escrow Defendants owed fiduciary duties to the money and to Plaintiffs and to safeguard the **Funds** and to maintain the **Funds** in a manner that would enable Plaintiffs to have the **Funds** available when needed to execute the contractually agreed to transaction.

60.  The MBI Defendants, the Dakota Defendants and the Escrow Defendants have refused to return the Plaintiffs fund and/or provide an accounting.

61.  While breaching their fiduciary duties, the MBI Defendants and Escrow Defendants acted for their own financial gain.

62.  As the direct, proximate result of the aforementioned breaches of fiduciary duties, the Plaintiffs have been harmed in that they have suffered the loss and use of their **Funds** (over $1,000,000) and have incurred additional damages as a proximate and foreseeable result of losing their **Funds**, all in an amount to be shown at trial. The conduct of the MBI Defendants and Escrow Defendants in breaching fiduciary duties owed to the Plaintiffs was malicious, oppressive and warrants the imposition of punitive damages.

### FOURTH CAUSE OF ACTION
### Professional Negligence

**Against MBI Defendants and Escrow Defendants**

63. Plaintiff reasserts and incorporates by reference all of the foregoing allegations in their entirety and further alleges:

64.    As purported professional investment, financial, escrow and other similar advisors, particularly with a specialty in financial transactions, MBI Defendants and Escrow Defendants owed Plaintiff a duty of care to provide independent, unbiased, objective investment advice with respect to Plaintiffs needs. The MBI and Escrow Defendants owed Plaintiff the duty to provide that investment and escrow advice in good faith in accordance with accepted professional standards. Defendants violated this duty of care by the acts alleged herein, including without limitation, by failing to properly perform due diligence, intentionally misrepresenting their capabilities, failure to follow escrow instructions, and failure to direct and/or return escrowed and trust funds as directed and required pursuant to the Escrow Instructions. In the process, the MBI and Escrow Defendants incompetently performed their professional services.

65. The Escrow Defendants failed to perform reasonable diligence and even failed to verify whether Dakota Holdings was a valid business entity in good standing with the State of California prior to releasing escrowed funds.

66. As a direct and proximate result of the foregoing conduct by the MBI and Escrow Defendants, Plaintiff has been damaged in the amount of the $1.0 million dollars of monies deposited into escrow and misappropriated as well as the damage to Plaintiff's business as a result of losing their working capital and source of funding.

67.    As a direct and proximate result of the foregoing conduct by the MBI and Escrow Defendants, Plaintiff has been damaged in the amount of the $1.0 million dollars of monies paid into escrow; the loss of reasonably expected income from the use of the Plaintiff's funds paid by;

FIRST AMENDED COMPLAINT          13          Case No.   CV 10-5475-GHK-RC

the attorneys' fees and other costs incurred by Plaintiff as a result of the wrongful conduct; and such other damages as Plaintiff has sustained and will continue to sustain in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Securities Fraud
### Against All Defendants

68.   Plaintiff reasserts and incorporates by reference all of the allegations herein in their entirety and further alleges:

69.   Defendants, by use of the means and instrumentalities of interstate commerce and by use of the mails, misrepresented and omitted to state material facts in connection with the purchase or sale of securities, as alleged above and as follows:

69.   The MBI Defendants and the Dakota Defendants were engaged to sell a security and to assist with the monetization of said security.

70.   The MBI and Dakota Defendants never intended to deliver a security other than the fraudulent financial instrument presented to the Escrow Defendants.

71.   The MBI Defendants made false statements regarding the offering and sale of a security from November 2009 through January 2010.

72.   The Dakota Defendants and the MBI Defendants continued to make false statements regarding the offering and sale of a security from February 2010 through August 2010.

73.   ELC employed Maxwell Wyatt while he and the other MBI Defendants continued their scheme to defraud TAP and ELC failed to take steps reasonably necessary to prevent hard to TAP.

74.  ELC had a duty to supervise Maxwell Wyatt's activities to make certain that he was not violating the rules governing registered representatives regarding the offering and sale of securities.

75.  Plaintiffs relied on the above material misrepresentations and omissions of material fact by the Defendants, and it was reasonably foreseeable that Plaintiffs would rely on said misrepresentations and omissions of material fact in agreeing to transfer funds to an improper account. Based on all of the above, it was reasonably foreseeable that Plaintiff would rely on these misrepresentations and omissions.

76.  By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. §§ 240.10b-5, 10b5-1, b5-2.

77.  As a direct and proximate result of the foregoing conduct by the Defendants, Plaintiff has been damaged in the amount of approximately $1.0  million dollars; the loss of reasonably expected income from the use of the funds paid by Plaintiffs; the attorneys' fees and other costs incurred by Plaintiffs as a result of defendants' conduct; and such other damages as Plaintiff has sustained and will continue to sustain in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Fraud
### Against MBI Defendants, Dakota Defendants and Escrow Defendants

78.  Plaintiff reasserts and incorporates by reference all of the foregoing allegations in their entirety and further alleges:

79.  In order to induce Plaintiffs to transfer large sums of money to an escrow account that was contemplated to be illegally broken, the MBI Defendants disguised their conduct as being that of Plaintiffs' "Funding Source" when in fact they intended to steal Plaintiff's funds with the assistance of the Escrow Defendants and the Dakota Defendants.

80.  To further the fraud, the MBI Defendants and the Dakota Defendants continued to represent that Plaintiff's funds were being used for legitimate purposes when in fact the MBI and Dakota Defendants had already distributed the funds to themselves personally.

81.  To add insult to injury, one of the Dakota Defendants, Rhett Landon Shepard was paid several hundred thousand dollars sometime in the Spring of 2010 as a commission on the sale of the purported security.  Mr. Shepard knew that a valid sale had not occurred at the time he received his compensation from the other Dakota Defendants and knew that the money was obtained under false pretenses.  Mr. Shepard would have been more involved with the transaction except for the fact that he was in a drug addiction rehabilitation center when the money was first stolen.  Despite the foregoing knowledge, Mr. Shepard has denied involvement and claims to have no knowledge of the transaction which he knows to be a false statement.

82.  The above affirmative representations, or material and intentional omissions of fact, made by each of the defendants were false when made and said defendants knew them to be false when made with the intention that Plaintiff rely upon them in entering agreeing to wire funds to the Escrow Account.

83.  As a direct and proximate result of the foregoing conduct by said defendants, Plaintiff has been damaged in the amount of the $1.0 million dollars of fees paid to defendants; the loss of reasonably expected income from the use of the funds paid by Plaintiffs; the attorneys' fees and other costs incurred by Plaintiffs as a result of defendants' conduct; and such other damages as Plaintiffs have sustained and will continue to sustain in an amount to be determined at trial.

84.  Plaintiffs are informed and believes and on that basis alleges that said defendants' conduct was willful, malicious, reckless, wanton and in knowing disregard of their professional

FIRST AMENDED COMPLAINT                16          Case No.   CV 10-5475-GHK-RC

obligations, such that Plaintiff is entitled to recover exemplary damages against said defendants in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### To Set Aside Fraudulent Conveyances
### Against MBI Defendants, Dakota Defendants and Escrow Defendants

85.  Plaintiffs incorporate paragraphs 1 through 84 above as if fully set forth herein.

86.  The Escrow Agreement that TAP Agreed to with the MBI and Escrow Defendants set forth specific conditions for releasing escrow funds.

87.     The MBI, Escrow and Dakota Defendants have either commingled funds or improperly transferred said funds without Plaintiff's consent and in violation of the Funding Agreement and Escrow Instructions.

88.     As such, Plaintiffs request the following relief: (1) that the transfers from the MBI, Escrow and Dakota Defendants to any account other than the Escrow Account be set aside and declared void to the extent necessary to satisfy Plaintiff's claims in an amount to be proved at trial; (2) that the property in the hands of the MBI, Escrow and Dakota Defendants be attached in accordance with the provisions of applicable state and federal law; (3) that the Thief Defendants be restrained from disposing of the property transferred until the claims of Plaintiff are satisfied in full; (4) that a temporary restraining order be granted in favor of Plaintiff enjoining and restraining the MBI, Escrow and Dakota Defendants, their representatives, attorneys, and agents from selling, transferring, conveying, or otherwise disposing of any of the property; (5) that an order pendente lite be granted Plaintiff, enjoining and restraining the MBI, Escrow and Dakota Defendants, their representatives, attorneys, servants, and agents from selling, transferring, conveying, assigning, or otherwise disposing of any of the property transferred; (6) that the judgment herein be declared a lien on the property transferred; (7) that an

order be made declaring that the Defendants hold all of the property transferred by the MBI, Dakota and Escrow Defendants and described above in trust for Plaintiffs; and (8) that the Defendants be required to account to Plaintiffs for all profits and proceeds earned from or taken in exchange for the property described above.

### EIGHTH CAUSE OF ACTION

### Unfair Business Practices Cal. Bus. & Prof. Code § 17200

### Against the MBI Defendants, Dakota Defendants and Escrow Defendants

89.   Plaintiff reasserts and incorporates by reference all of the foregoing allegations in their entirety and further alleges:

90. The Unfair Business Practices Act defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. California Business & Professions Code § 17200 *et seq.*

91.   The MBI, Dakota and Escrow Defendants have violated the Unfair Business Practices Act by engaging in the unlawful, unfair and/or fraudulent business acts and/or practices alleged herein alleged herein, including the mail fraud, wire fraud, securities fraud.

92.   As a direct and proximate result of the foregoing conduct by defendants, Plaintiff has been damaged in the amount of approximately $1.0 million dollars of monies placed into escrow under false pretenses; the loss of reasonably expected income from the use of the funds paid by Plaintiff; the attorneys' fees and other costs incurred by Plaintiff as a result of defendants' conduct; and such other damages as Plaintiff has sustained and will continue to sustain in an amount to be determined at trial.

93. As a direct and proximate result of the foregoing conduct by defendants, numerous

other members of the public have also been deceived into hiring the MBI and Dakota Defendants as their "Funding Source."

94. The Unfair Business Practices Act provides for restitution for violations and disgorgement of monies. Plaintiff thereby requests that this Court restore all monies and fees paid by him and all other clients of defendants. Plaintiff also requests that the Court enter injunctive relief against defendants, preventing them from engaging or promoting the illegal securities. This private enforcement is necessary to enforce the disgorgement of defendants' wrongfully obtained fees, prevent defendants from dissipating funds wrongfully obtained, and obtain injunctive relief preventing defendants from further engaging in such wrongful conduct.

95. The requested relief will confer a significant pecuniary benefit on the numerous other members of the public who were deceived by defendants' wrongful acts.

### NINTH CAUSE OF ACTION

### Unjust Enrichment
### Against MBI and Dakota Defendants

96. Plaintiff reasserts and incorporates by reference all of the foregoing allegations in their entirety and further alleges:

97. In the event that the MBI and Dakota defendants deny that they entered into contracts with Plaintiff to provide professionally competent services, and investment advice, to provide them with a legitimate business transaction with legal benefits, to exercise the applicable standard of care, loyalty and honesty, and to comply with all applicable rules of professional conduct, Plaintiff hereby pleads unjust enrichment in the alternative.

98. Plaintiffs deposited $1.0 million dollars and the MBI and Dakota Defendants stole the money.

99.     Defendants provided Plaintiff with advice that defendants knew or should have known to be wrong and improper in furtherance of a scheme to take control of Plaintiffs' funds. Defendants also acted contrary to the applicable respective rules of professional conduct and contrary to their obligation to Plaintiff to provide them with professionally competent advice, investment advice by basing their advice solely on their desire to coerce Plaintiffs to surrender large sums of money, rather than providing professional services or providing accurate disclosures.

100. As a direct and proximate result of the foregoing conduct, defendants have been unjustly enriched by having received the benefit of approximately $1.0 million dollars for a sham transaction that defendants knew or should have known to be sham, and having unjustly retained said monies paid by Plaintiff at the expense of Plaintiff.

## **TENTH CAUSE OF ACTION**

### **False and Misleading Advertising 15 U.S.C. § 1125(a)(1)(B) Against MBI Defendants and ELC**

101.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 100 above.

102.     The MBI Defendants and ELC used in interstate commerce of the numerous marks on and in connection with the services it sells under those marks violate Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), because they constitute uses of words, terms, names, false designations of origin and false and misleading descriptions and representations of fact in commercial advertising and promotions that misrepresent the nature, characteristics and qualities of The MBI Defendants services.

103.  ELC knew or should have known that MBI and one of its Registered Representatives was using the Internet to advertise the offering and sale of securities under false pretenses and therefore consented.

104.     On information and belief, The MBI Defendants foregoing acts have been willful and deliberate.

105.     Plaintiffs have been damaged by MBI Defendants' actions  and ELC's failure to act in the form of lost sales, profits and goodwill.

### ELEVENTH CAUSE OF ACTION

### Failure to Supervise and Violation of Section 20(a) of the Exchange Act of 1934 Against ELC

106.  Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 105 above.

107.   ELC employed Maxwell Wyatt as a registered representative beginning in January 2010.

108.  ELC had knowledge or at least a duty to know that Maxwell Wyatt was advertising himself as the Chief Financial Officer of MBI on the internet.

109.  ELC failed to supervise Mr. Wyatt in the performance of his duties and outside business activities.

110.  Had ELC properly supervised Mr. Wyatt, the ongoing fraud from January 2010 through the present could have been prevented.

111.     Plaintiff has been damaged by ELC's failure to act in the form of lost money, lost sales, profits and goodwill.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that this Court enter judgment in its favor on all counts of this Complaint and grant it the following relief:

1. An injunction prohibiting the Defendants from engaging in sales of fraudulent securities;

2. For appointment of a receiver over the MBI and Dakota Defendants business and personal accounts to prevent further fraudulent conveyances;

3. For tort damages to Plaintiff measured by the loss of their property held in escrow and the foreseeable lost business opportunities;

4. Damages in an amount to be determined at trial and trebled pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

5. An award of The MBI and Dakota Defendant's profits wrongfully derived from its false and misleading representations of fact in commercial advertising and promotions, pursuant to Section 35 of the Lanham Act, 15, U.S.C. § 1117.

6. Punitive damages on the account of the MBI, Dakota and Escrow Defendant's willful, wanton, and persistently irresponsible and dangerous conduct in knowingly making false and misleading representations concerning its professional status.

7. A declaration that this is an "exceptional case," and an award to Plaintiffs of their attorneys' fees pursuant to Section 35 of the Lanham Act, on account of the Thief Defendants willful, wanton, and persistently irresponsible and dangerous conduct in knowingly making false and misleading representations of fact in its commercial advertising and promotions.

8. An award of the costs and expenses incurred by Plaintiffs in litigating this action.

9. For pre-judgment interest;

10. For the imposition of a constructive trust to prevent further fraudulent conveyances;

11. For an order to freeze the MBI and Dakota Defendants' assets until any judgments have been satisfied; and

12. For all other relief the Court deems just and proper.


**PHILP J. LAYFIELD, ATTORNEY AT LAW**


**DATED:  September 9, 2010**            **By:_____/s/_____**
                                            **Philip J. Layfield**
                                            **Attorney for Plaintiff**

11. For an order to freeze the MBI and Dakota Defendants' assets until any judgments have been satisfied; and

12. For all other relief the Court deems just and proper.


**PHILP J. LAYFIELD, ATTORNEY AT LAW**


**DATED:  September 9, 2010**          By: _____/s/_____

                                                 **Philip J. Layfield**
                                                 **Attorney for Plaintiff**

EXHIBIT "A"

To:           Ms. Kathleen Partin
              Special Administrator of Escrow Agents (California)

From:         Thomas J. Hess of Rafferty Kobert Tenenholtz
              Bounds & Hess P.A.

Date:         May 6, 2010

Re:           Commercial Escrow Services, Inc.
              Ms. Antoinette Harding, Escrow Officer
              CA License No. 963 5075
              3478 Buskirk Avenue, Suite 242
              Pleasant Hill CA, 90013-1105

This firm represents Total Access Payments, Inc. ("TAP"), a Delaware corporation located at 20783 N 83rd Ave, Suite 103-244, Peoria, Arizona 85382. We believe that TAP has been victimized in the amount of One Million Dollars ($1,000,000.00) in a Ponzi scheme or similar fraud in which Commercial Escrow Services, Inc. ("Commercial Escrow"), a registered California escrow agent, was either a willful participant or a grossly negligent facilitator. We believe that Commercial Escrow's actions and conduct in this regard violate the California Escrow Law.

Commercial Escrow and its principals have refused, numerous times, to provide us with any documentation or evidence whatsoever as to the disposition of the $1MM entrusted to them. The pertinent facts and referenced documentation follow.

1. The Escrow Deposit   TAP wired the sum of One Million Dollars ($1,000,000.00) to Commercial Escrow on December 30, 2009. Commercial Escrow acknowledged receipt of this escrow, and the source of the escrow (TAP), by letter of January 4, 2010. **See Exhibit A.**

2. The Escrow Transaction

A. Escrow Agreement   Commercial Escrow was charged to hold TAP's escrow under the terms and conditions of its proprietary Escrow Agreement ("Escrow Agreement") dated December 19, 2009. **See Exhibit B.** The Escrow Agreement signatories were two companies that we now believe are regular business partners with Commercial Escrow: (1) Maximum Business Innovations, Inc. ("MBI"), located at 620 Newport Center Drive, Suite 1100, Newport Beach, CA 92660; and (2) Dakota Holdings (contact information never provided). **See Exhibit B.** Additional information on MBI and Dakota are provided in Section D below.

B. Terms of Escrow   Commercial Escrow committed in its Escrow Agreement to hold TAP's escrow for a period of no more than 21 days pending the presentation of a Standby Letter of Credit ("SBLC") by Dakota Holdings and/or MBI during that 21-day period. **See Exhibit B.** Commercial Escrow was obligated to return the $1MM escrow directly back to TAP if an SBLC was not presented by MBI and/or Dakota Holdings by January 25, 2010. **See Exhibit A and B.**

C. The Escrow Release   Commercial Escrow released TAP's $1MM to Dakota Holdings on January 26, 2010, one day after the twenty-one day holding period expired. **See Exhibit C.** This release notice was sent only to MBI and Dakota Holdings, never to TAP, the acknowledged escrow provider. TAP obtained a copy of the release notice from MBI only after threatening to report MBI to the FBI and SEC. MBI and Dakota Holdings have now advised TAP that the $1MM is "gone". They no longer respond to TAP's requests for information.

Commercial Escrow released TAP's $1MM based upon an internet template manufactured by MBI and Dakota Holdings for a (blanket and unidentified) Certificate of Deposit ("CD"). **See Exhibit C.** The Escrow Agreement clearly required that an SBLC be presented to Commercial Escrow as a condition of escrow release, not a CD instrument. **See Exhibit B.**

Commercial Escrow further released TAP's $1MM based upon a phony "SWIFT MESSAGE" CD Instrument that was fraudulently manufactured by MBI and Dakota Holdings. Again, the Escrow Agreement required an SBLC be presented to Commercial Escrow, not a CD Instrument.

MBI produced a suspiciously sanitized copy of the CD Instrument that it claims was presented to Commercial Escrow to break escrow. MBI produced this suspicious document only after TAP threatened to report MBI to the FBI and the SEC. This phony and sanitized instrument is attached as **Exhibit D.** It is (intentionally) barely legible. The phony CD Instrument has language at the end (highlighted in Exhibit D) that has been widely and specifically identified by the International Chamber of Commerce as being an unmistakable indicator of fraud. **See Exhibit E.** Commercial Escrow will not produce the unsanitized escrow-breaking documents.

I confronted the three parties (i.e., Commercial Escrow, MBI, and Dakota Holdings) on this phony document and the escrow release during a conference call on April 22, 2010 (brought about by my two demand letters to Commercial Escrow). This call was initiated by Commercial Escrow (T. Hardstone); an MBI principal (Kevin McBride); and a Dakota Holdings principal (Matt Anderson). All three individuals were very evasive and elusive in their explanations and responses to my questions on the escrow release and the (phony) documentation relied upon for the release. Commercial Escrow, MBI, and Dakota Holdings all committed to follow-up with me on this matter on April 26, 2010. That follow-on contact never occurred. Commercial Escrow now refuses to answer any of my post-call requests for further information.

We believe that MBI and Dakota Holdings are engaged in a Ponzi Scheme or similar fraud. The questionable and suspicious actions by Commercial Escrow and its principals in (1) releasing TAP's $1MM based on non-conforming/phony documents; and (2) refusing to provide any information on the escrow release indicate that Commercial Escrow and its principals are willing and profiting participants with MBI and Dakota Holdings in this Ponzi Scheme/fraud.

We respectfully request the assistance of the Special Administrator in compelling Commercial Escrow to release to TAP all the information and documentation concerning Commercial Escrow's release of TAP's $1MM. We further request the assistance of the Special Administrator in obtaining any appropriate and available remedies and/or recovery in TAP's favor against Commercial Escrow under the California Escrow Law.

D. MBI Information

Maximum Business Innovations, Inc. ("MBI") is located at 620 Newport Center Drive, Suite 1100, Newport Beach, CA 92660. We have discovered that this is a virtual office. MBI lists an additional address of 2023 West 235th Street Place, Torrance, CA 90501 on its corporate documents.

MBI convinced TAP to enter into a Funding Agreement dated 29 December 2009. This Funding Agreement required TAP's delivery of $1MM up front as funding fees. Commercial Escrow was the escrow agent listed and chosen by MBI to receive and "protect" TAP's $1MM. We now believe that MBI and Commercial Escrow had a pre-existing relationship and worked in concert with Dakota Holdings to convert TAP's $1MM in a Ponzi Scheme or similar fraud.

MBI's website claims that the company was "established in 1999" as an "Asset Based Lender, Asset Management Company, and a Structured Finance Consulting Firm with satellite offices in Boston MA and Fresno CA". We have discovered that this information is false, misleading, and deceptive.

MBI is a Colorado corporation that qualified to do business in California in October 2008. The original company was formed in Colorado in 1999 as "Maximum Innovations" by principals unrelated to the present owners/officers/directors. The company was dissolved for a period of six years (2002 – 2008) before the present principals revived and reinstated it in June 2008 as "Maximum Business Innovations." MBI has been operating in its present business line for less than two years, certainly not "since 1999."

MBI has no state or federal licenses to engage in the activities it promotes. MBI has significantly changed its website and deleted all the background information on its principals since its fraud on TAP. Its re-configured (post-fraud) website address is www.mbiinc.org. A copy of its extensive pre-fraud website is attached as hard copy. **SEE Exhibit F.**

The principals of MBI listed and/or profiled on its pre-fraud website were as follows:

- Kevin McBride - Founding Principal & Chief Executive Officer
  Gene Houston-Principal & President
- Anton Nel – Principal and Strategic Financial Partner
- Michael Roddy – Principal & Executive VP of Real Estate Acquisition
- Scott Shepard - Business Development & Project Management
- Michael Gilbert - Business Development & Project Analysis
- Maxwell Wyatt – Chief Financial Officer
  (holds CA real estate license and FINRA Series 63, 7, and 27 licenses with a separate and unrelated company)
- Ken Kuwabara - Senior Managing Director, Broker
  (CA Real Estate and Mortgage Broker)
- Jeremy Zick – Client Relations
- Michael Engeman – Client Relations

As of the week of April 26th, MBI has deleted all the biographies and contact details of its principals and officers. MBI has also deleted all references to principal and key officers Anton Nel, Maxwell Wyatt (CFO and FINRA license holder), and Ken Kuwabara (Sr. Managing Director and real estate broker). As of the week of April 26th, MBI and its (disclosed) principals have ceased all their commercial interaction with TAP. Additionally, MBI and it principals, in concert with Commercial Escrow, now refuse to answer any of TAP's communications requesting information on the $1MM.

3

E. Dakota Holdings Information

Dakota Holdings and its principals have provided TAP with absolutely no identifying or contact information. We know that the principals of Dakota Holdings are Matthew (Matt) Anderson and Tim Gates, both California residents. Matthew Anderson's e-mail address is havoq1@yahoo.com. He has consistently refused to provide any other contact information. Tim Gates has refused to communicate, period.

Respectfully Submitted,

Thomas J. Hess, Esq.
Attorney at Law
Rafferty Kobert Tenenholtz
Bounds & Hess P.A.
1401 Brickell Ave.
Suite 825
Miami, FL 33131
(305) 373-0330 (ph)
(305) 373-2735 (fax)
THess@raffertylawyers.com (e-mail)
tjhess@earthlink.net (e-mail)

4

000028



**Commercial Escrow Services, Inc.**
3478 Buskirk Ave., Suite 242
Pleasant Hill, Ca. 94523



EXHIBIT

A

January 4, 2010

To Whom It May Concern:

Re:  Escrow #39-5099-AH

Escrow received the amount of $1,000,000.00 on 12/30/09 from Total Access Payments Inc. for the benefit of Maximum Business Innovations Inc.  In the event of cancellation after 21 days these funds less the escrow fees shall be returned to the account of origin.

Thank you for letting Commercial Escrow Services, Inc. be of service to you.  Please think of us for your next escrow.

Cordially,

A.  (Toni) Hardstone
President/Manager

**HAPPY HOLIDAYS!**

```
EXHIBIT
  B
```

Total Access Payments, Inc       Contract No.: MBI/TAP-091229

---

## COMMERCIAL ESCROW SERVICES, INC.

Commercial Escrow Services Inc has been issued an Escrow Agent's license by the California Department of Corporations, 320 West Fourth Street, Suite 750, Los Angeles, Ca. 90013-1105, License No. 963 5075.

COMMERCIAL ESCROW SERVICES, INC.
3478 BUSKIRK AVENUE, SUITE 242, PLEASANT HILL, CA 94523
PHONE: (925) 933-9960 / FAX: (925) 933-9965
DATE: December 19, 2009
ESCROW OFFICER: A. HARDSTONE
ESCROW NO: 39-5099-AH

## ESCROW INSTRUCTIONS –

**PARTIES TO THIS ESCROW:** This escrow is established by and between Maximum Business Innovations, hereinafter referred to as ("FIRST PARTY") and consultant Dakota Holdings, hereinafter referred to as ("SECOND PARTY"), collectively referred to as ("Parties or Principals").

**PURPOSE OF THIS ESCROW:** The Second Party shall cause bank to provide a SBLC (Stand By Letter of Credit) issued in the amount of: $XX,000,000.00 USD (XXXXX Million XXXXX Hundred Thousand United States Dollar), and with the SBLC having a 12 (Twelve) Month duration, issued from BANK NAME (Hereinafter referred to as "The Instrument") to the nominated beneficiary and in exchange for providing The Instrument the Second Party shall be paid. The First Party shall deposit by wire transfer the amount of $XX,000,000.00 USD (XXXXX Million United States Dollars) into escrow. Upon Receiving said funds in Escrow, the Parties shall communicate to verify agreed Verbiage of the said Instrument and to confirm the Transaction. Copy of the Final Agreed Draft "Text" of the Instrument will be sent to Escrow Agent.

Immediately upon Escrow Agent receiving confirmation of the Instrument, and upon Escrow Agent (1) confirming the said Instrument mirrors the Draft and (2) verifying that said Instrument was issued, the Escrow Agent shall then (3) immediately release the funds less escrow fees and charges to the Second Party according to the Disbursement Instructions, and (4) upon release of funds, this escrow is considered closed.

**ESCROW AGENT DUTIES:** Escrow shall receive by wire transfer from the First Party in the amount of $XX,000,000.00 USD (XXXXX Million United States Dollars).   Immediately upon Escrow Agent receiving confirmation of the Instrument, and upon Escrow Agent (1) confirming the said Instrument mirrors the Draft and (2) verifying that said Instrument was issued, the Escrow Agent shall then (3) immediately release the funds less escrow fees and charges to the Second Party according to the Disbursement Instructions, and (4) upon release of funds, this escrow is considered closed.

**NOTICES:** All notices, requests, demands, and other communications under this escrow shall be either in writing or sent by facsimile transmission with written confirmation mailed and shall be deemed to have been duly given on the date of service if served personally, or sent by facsimile transmission, or on the second day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed. All funds received into escrow shall be deposited with other escrow funds in a general trust account of Commercial Escrow Services, Inc., unless otherwise instructed. Escrow Agent is not a party to, or bound by, any provisions contained in any property which may be deposited under, evidenced by, or arise out of these instructions, and with respect thereto, acts as a depository only and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of any Property or with respect to the form or execution of the same, or the identity, authority or right of any person executing or depositing the same. Escrow Agent shall not be required to take or be bound by notice of any default of any person, including any Principal, or to take any action with respect to such default whether or not such action involves any expense or liability. These instructions shall not be subject to modification or rescission except upon receipt by Escrow Agent (at the
office named above) of written instructions from each of the principals or their successors in interest, and no such rescission or modification shall be effective unless consented to by Escrow Agent in writing.

---

TAP _____        MBI _____                          Page 15

000030

Total Access Payments, Inc    Contract No.: MBI/TAP-091229

Principals hereby indemnify and hold Escrow Agent harmless against any loss, liability, damage, cost or expense, including reasonable attorneys' fees, (a) related in any way to Escrow Agent's acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be signed by Principals or any other proper person, and (b) incurred in connection with any act or thing done hereunder.

Escrow Agent shall not be liable for any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which Escrow Agent may do or refrain from doing in connection herewith, except its own gross negligence or willful misconduct. Escrow Agent shall have duties only to the Principals, and no person shall be deemed a third party beneficiary of these instructions. Escrow Agent may consult with legal counsel in the event of any dispute or question as to the construction of these instructions or Escrow Agent's duties there under and Escrow Agent shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel. In the event of any disagreement between the Principals or any of them or any other person or persons whether or not named in these instructions, and adverse claims or demands are made in connection with or for any of the Property, Escrow Agent shall be entitled at its option to refuse to comply with any such claim

or demand so long as such disagreement shall continue, and in so doing, Escrow Agent shall not be or become liable for damages or interest to the Principals, or any of them, or to any other person or persons for

Escrow Agent's failure or refusal to comply with such conflicting or adverse claims or demands. Escrow Agent shall be entitled to continue so to refrain and refuse so to act until: the rights of the adverse claimants

have been fully adjudicated in a court assuming and having a jurisdiction of the claimants and the Property; or all differences shall have been adjusted by agreement, and Escrow Agent shall have been notified thereof in writing by all persons deemed by Escrow Agent, in its sole discretion, to have an interest therein.

In addition, Escrow Agent in its sole discretion, may file a suit in interpleaded for the purpose of having the respective rights of all claimants adjudicated, and may deposit with the court all of the Property; and the Principals agree to pay all costs and counsel fees incurred by Escrow Agent in such action; said costs and fees to be included in the judgment in any such action. In consideration of acceptance of this appointment by Escrow Agent, the Principals agree to indemnify and hold Escrow Agent harmless as to any liability incurred by Escrow Agent to any person, firm or corporation by reason of its having accepted same or in carrying out any of the terms hereof, and to reimburse Escrow Agent for all its expenses, including among other things, counsel fees and court costs incurred by reason of its position or actions taken pursuant to these Escrow Instructions. The Principals hereby agree that the Escrow Agent shall not be liable to any of them for any actions taken by Escrow Agent pursuant to the terms hereof. Escrow Agent is hereby authorized, in its exclusive discretion, to obey and comply with all writs, orders, judgments or decrees issued by any court or administrative agency affecting any money, documents or things held by Escrow Agent. Escrow Agent shall not be liable to any of the parties hereto, their successors, heirs or personal representatives by reason of Escrow Agent's compliance with such writs, orders, judgments or decrees, notwithstanding such writ, order, judgment or decree is later reversed, modified, set aside or vacated. If any action is brought to interpret or enforce these instructions, or any part hereof, the Principals jointly and severally agree to pay to Escrow Agent all Escrow Agent's fees, accounting fees, special and extra service fees, and other costs related to such action. In the event the escrow established hereby is canceled, the Principals jointly and severally shall nevertheless pay to the Escrow Agent the initial fee together with all costs and expenses of Escrow Agent. Notwithstanding anything in these instructions to the contrary, Escrow Agent may, in its sole discretion, upon ten (10) days written notice to any of the Principals, resign as Escrow Agent and Escrow Agent shall be entitled to reimbursement for those costs and expenses incurred to the date of such resignation. Upon cancellation by the Principals or resignation by Escrow Agent, after deducting Escrow Agent's fees, costs and expenses, the balance of any funds or Property shall be returned to the respective Principals who shall have deposited same. In the event that: Escrow Agent performs any

services not specifically provided herein or there is an assignment or attachment of any interest in the subject matter of the escrow established hereby or any modification thereof, or any dispute or controversy arises hereunder, or Escrow Agent is named a party to, or intervenes in, any litigation pertaining to this escrow or the subject matter thereof, Escrow Agent shall, in addition to fees and charges for ordinary services, be reasonably compensated therefore and reimbursed for all costs and expenses, including but not limited to attorneys' fees, occasioned thereby. Escrow Agent shall have a first lien on the Property for such compensation and expenses, and the Principals agree jointly and severally to pay the same to Escrow Agent. These escrow instructions are not intended to amend, modify, or supersede any prior contract or agreement that may contain certain contingencies by and between the Parties that may not be set forth in these instructions. Escrow Agent is a party only to these instructions and shall have no responsibility for the enforcement or adhere to any other agreements of the Parties.

TAP _____    MBI ___\|\^\/___    Page 16

Total Access Payments, Inc        Contract No.: MBI/TAP-091229

Escrow Agent shall be entitled to an initial, non-refundable set-up fee ("initial fee") of $2,200.00, payable concurrently with its acceptance plus $2 per thousand upon closing, and for additional compensation as follows: $50.00 per wire.

Cancellation: Principals hereby irrevocably waive any right of cancellation within 21 days of deposit of funds into escrow.  If after signing Escrow Instructions and wiring funds for the requested Instrument(s) to escrow, neither principal will accept or agree to a cancellation or such request of the other, nor will Escrow Agent.  If the Instrument has not been evidenced to Escrow Agent within 21 days and a request for cancellation is made after 21 days, funds will be returned to depositor via instructions to Escrow less initial set-up fee(s) and Escrow will be deemed cancelled, with no further action required or obligated by Parties named herein.  In the event of cancellation as described here, Parties agree to hold counter party harmless.

The Principals understand that Escrow Agent will charge additional fees, including premium hourly fees, for any services performed according to these Escrow Instructions, or any modification or any service not specifically provided therein, that involve concerted effort, employees working overtime, expedited handling of any aspect of the Escrow, or other similar services.

These escrow instructions may only be amended by a writing signed by all Principals.
UPON THE DISBURSEMENT OF THE FUNDS AND/OR DOCUMENTS AS DESCRIBED HEREIN, THIS ESCROW SHALL BE CONSIDERED CLOSED AND NO LATER THAN JANUARY 10, 2010 OR AS SOON THEREAFTER AS THE CONDITIONS ARE MET.

These instructions may be executed in counterparts, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery, and said counterparts together shall constitute one and the same instrument.

TAP_____        MBI _____        Page 17

Total Access Payments, Inc        Contract No.: MBI/TAP-091229

---

# COMMERCIAL ESCROW SERVICES, INC.

Commercial Escrow Services Inc has been issued an Escrow Agent's license by the California Department of Corporations, 320 West Fourth Street, Suite 750, Los Angeles, Ca. 90013-1105, License No. 963 5075.

DATE: DECEMBER 23, 2009

WIRING INSTRUCTIONS

BANK:                        UNION BANK OF CALIFORNIA
                             1980 SATURN STREET
                             MONTEREY PARK, CA 91755

ROUTING #:                   122000496

CREDIT TO NAME:              COMMERCIAL ESCROW SERVICES, INC.
                             ESCROW TRUST ACCOUNT

ACCOUNT #:                   9120087727

FOR THE BENEFIT OF: MAXIMUM BUSINESS INNOVATIONS, INC.

AMOUNT:                      $1,000,000.00 USD

ESCROW NO:                   39-5099-AH

TAP _____        MBI _____                        Page 19

000033

Total Access Payments, Inc        Contract No.: MBI/TAP-091229

# ESCROW CANCELLATION INSTRUCTIONS

**RE: Commercial Escrow Services Inc. Escrow No. 39-5099-AH**
COMMERCIAL ESCROW SERVICES, INC.
3478 BUSKIRK AVENUE, SUITE 242, PLEASANT HILL, CA 94523
PHONE: (925) 933-9960 / FAX: (925) 933-9965
DATE: December 19, 2009
ESCROW OFFICER: A. HARDSTONE
ESCROW NO: 39-5099-AH

ESCROW CANCELLATION INSTRUCTIONS

Attn: A. HARDSTONE

You are hereby notified in writing of the cancellation of escrow No. 39-5099-AH. Please return the wired escrow deposits directly to the accounts from which the wired escrow deposits originated. Please provide written confirmation of the return of the escrow deposit(s) to their account of origin.

It is know that applicable fees will be deducted per the provided escrow instruction. Please provide a statement of such fee's upon cancellation of escrow No. 39-5099-AH

Please return specific deposit to;

Total Access Payments Inc.
Bank Name :           Wells Fargo NA
Acct. Name :          Total Access Payments Inc.
Account Number :      3316582281
ABA Number :          121000248
Bank Address :        8281 W. Lake Pleasant Parkway Peoria AZ 85382
Bank Officer Name :   Joy Adiska
Bank Officer E-mail : joy.l.adiska@wellsfargo.com
Bank Phone :          (623) 872-4347

TAP _____        MBI  ⟋ᗯ⟍           **Page 26**

000034

**Commercial Escrow Services, Inc.**
3478 Buskirk Ave., Suite 241
Pleasant Hill Ca. 94523

> EXHIBIT
>
> C

January 26, 2010

Maximum Business Innovations and Dakota Holdings
Via fax

Re: Escrow #09-3099-AH

This letter is to confirm the Escrow Agent's duties as described in the Escrow Instructions dated January 7, 2010. Escrow received monies into escrow. Escrow Agent received a copy of the Instrument by email, and Escrow Agent received the Instrument delivered via Draft attached Exhibit's attached hereto and made a part hereof. Escrow Agent released the funds into escrow fees and charges to the Desired Party according to the Disbursement Instructions and upon the release of the funds, this escrow was considered closed.

Cordially,

A. Uheal Neshimor
Escrow Manager

Phone: (925) 891-9960          Email: jana@commercialescrow.com          Fax: (925) 323-9965

EXHIBIT A

COLLATERAL DRAFT SWIFT LANGUAGE

DATE:  January xx, 2010

TO:    RECEIVING BANK

—SWIFT NARRATIVE—

WE, [BANK NAME, ADDRESS], WITH FULL BANKING RESPONSIBILITY AND AUTHORITY, HEREBY
UNCONDITIONALLY AND IRREVOCABLY WITHOUT ANY PROTEST, DELAY OR NOTIFICATION, GUARANTEE TO
PAY AGAINST THE CERTIFICATION OF DEPOSIT (CD) UNDER FOREIGN CURRENCY (UNITED STATES DOLLARS)
SAVINGS ACCOUNT DENOMINATED AS ACCOUNT NUMBER: [[ACCOUNT NUMBER]] IN THE NAME OF
[[APPLICANT NAME AND ADDRESS]] OR THE BEARER OR THE HOLDER THEREOF, AT MATURITY DATE, THE
SUM OF [[US MILLION OR GREATER]] UNITED STATES DOLLARS, ISSUE DATE: [MONTH/DAY/YEAR],
MATURITY DATE [[MONTH/DAY/YEAR]], WITH ROLLS AND EXTENSIONS TO THREE (3) YEARS DEPENDING
ON THE PROJECTS LOCATED [[LOCATION]] UPON BENEFICIARY'S FIRST WRITTEN DEMAND, PRESENTATION
AND SURRENDER OF THIS CERTIFICATION OF DEPOSIT AT THE COUNTERS OF THE GUARANTOR BANK.

SUCH PAYMENT SHALL BE MADE WITHOUT SET-OFF, FREE AND CLEAR OF ANY LIENS, ENCUMBRANCES,
CHARGES, DEDUCTIONS AND RESTRICTIONS, FEES OR WITHHOLDINGS OF ANY NATURE.

000036

WE HEREBY SEND THIS BANK INSTRUMENT TO THE ACCOUNT OF [[BENEFICIARY NAME]], ACCOUNT NUMBER: [[ACCOUNT NUMBER]]  IN YOUR BANK AS RECEIVER WITH THE BENEFICIARY NAME [[BENEFICIARY NAME]] OR OUR CERTIFICATION OF DEPOSIT TO OBTAIN A LINE OF CREDIT FOR THE PROJECT FUNDING IN [[LOCATION]] AND FOR THE BENEFIT OF YOUR CLIENT [[BENEFICIARY NAME]] AND OUR CLIENT [[APPLICANT NAME AND ADDRESS]] TO PERFORM A JOINT AGREEMENT AND THE ORIGINAL HARD COPY OF THE CERTIFICATION OF DEPOSIT WILL BE DELIVERED BY SECURE BANK BONDED COURIER WITHIN SEVEN (7) DAYS.

THIS CERTIFICATION OF DEPOSIT IS CONFIRMABLE, NEGOTIABLE, TRANSFERABLE, ASSIGNABLE, AND DIVISIBLE WITHOUT PRESENTATION OF IT TO US AND WITHOUT ANY FEES AND DEDUCTIONS.

THIS CERTIFICATION OF DEPOSIT IS AN OPERATIVE CASH BACKED INSTRUMENT AND MAY BE VERIFIED BANK TO BANK.

-END NARRATIVE-

***** NOTICE ***** Exhibit text may vary without change in the intrinsic meaning. Bank will have its own compliance approved text. This is only intended as an example of meaning and is not required word for word.

000037



EXHIBIT

D

000038



02/11/2010 19:21 FAX                                                      ☎0001/0001

Our attention: ████████████

To: ████████████

Attention: ████████████

Applicant: ████████████

Account #: ████████████

Cr: ████████████

Re:   Delivery of your SWIFT MT 700, 999 to ████████████

Well, Authorized bank/officer of ████████████ confirm that we ████████████ have received your Three (3) SWIFT MT 700 Copies, and One (1) SWIFT MT 999 copy from our client.

We'll request you to send these four SWIFT Logies and This page (01) of ████████████ to the bank coordinates as below to ████████████:

Receiver: ████████████

Swift key Arrangement: ████████████

We'll hereby further confirm that our ████████████ swift and financing capacity in our bank's ████████████ several banks in ████████████ SWIFT and verify authentication the SWIFT discussion.

Best Regards

Bank Officer ████████████
Senior General Manager

Direct Tel: ████████████
E-mail: ████████████

000039



ICC - The world business organization

**EXHIBIT**
*E*

**News**

## Traders warned about non-existent ICC instruments quoted on Internet

Paris, 1 April 2009

Traders are warned to be aware of fraudulent business offers on the Internet quoting non-existent instruments of ICC. The false references most frequently concern trading in currencies, commodities, gold and financial instruments

Elaborate websites soliciting export and import business are offering get-rich-quick deals. Some include full texts of bogus ICC non-circumvention and non-disclosure agreements. Other phoney references to watch out for are "ICC Regulations 400/500/600" and "ICC Prove and Move Rules".

No such ICC documents or rules exist. Their appearance on websites should be seen as indicating a possible scam. They may in some cases be used to lend credibility to fraudulent transactions.

The genuine version of ICC's non-circumvention and non-disclosure agreement is ICC Publication No. 619, ICC Model Occasional Intermediary Contract', available for sale at the online ICC Business Bookstore and through ICC national committees.



Traders are warned to be aware of fraudulent business offers on the Internet quoting non-existent instruments of ICC

Traders are well advised to familiarize themselves with ICC rules and mechanisms that are used every day in the conduct of trade, for example the rules governing letters of credit. The current version of Uniform Customs and Practice for Documentary Credits (UCP) is known as UCP 600. UCP 500 is out of date and UCP 700 has yet to be issued

"For years, incautious investors and traders have fallen victim to fraudulent proposals involving paper documents quoting non-existent ICC rules, and often they have been cheated of large sums. Now it appears that the Internet is being used as a vehicle for these schemes. The terminology changes constantly, but the risk is always there," said ICC First Director Martin Wassell

An added difficulty is that the documents wrongly quoting the ICC are not necessarily designed to defraud unwary investors. In some cases legitimate traders innocently quote the non-existent rules, having copied the reference from correspondence they have received or from other websites.

ICC's London-based Commercial Crime Bureau (CCB), part of ICC's Commercial Crime Services, keeps close track of all types of documentary fraud and issues warnings as soon as it detects new methods of parting the gullible from their money. Any investor wishing to check out a dubious proposal is advised to contact CCB, or ICC in Paris.

**Additional Information**
* ICC Commercial Crime Bureau

**For further information, please contact :**
Dawn Chardonnal
Communications Manager
Tel: +33 (0)1 49 53 29 07
Click here to email

SHARE

Maximum Business Innovations



Copyright 2009 Maximum Business Innovations. All Rights Reserved.

About MBI                                                                    Page 1 of 1



**MBI**                                                                    Monday, April 26, 2010

HOME        ABOUT MBI        MBI TEAM        CLIENT LOGIN

A Forward Thinking
Group of Professionals

### About MBI

Maximum Business Innovations, Inc (MBI) established in 1999, is an Asset Based
Lender, Asset Management Company, and a Structured Finance Consulting firm
headquartered in the financial district of Orange County, Ca., with satellite offices
located in Boston, MA. and Fresno, CA.

Our team of highly skilled and qualified professionals is comprised of former top level
banking executives, top level broker-dealer executives, entertainment/production
executives, as well as successful Real Estate professionals, which specialize in
development and construction.

With the ongoing credit crisis, MBI has banded together and created outside the box
funding solutions. With our team and our strategic partners, this allows clients to
leverage current assets and equity to access debt and secure financing that greatly
enhances the ultimate goal of success. We have limited and liberal project guidelines for
underwriting and provide strong exit strategies that employ limited debt load to the
project or client.

Cumulatively our team has originated multi-millions of dollars in loans, credit facilities,
and debt instruments. We have formulated a process so that projects in need of outside
the box and non-institutionalized funding can leverage our years of experience and
relationships to achieve that objective.

**Press Release Coming Soon**

Copyright 2009 Maximum Business Innovations. All Rights Reserved.

MBI Team                                                                  Page 1 of 1



**MBI Team**

**Management Team**

Kevin McBride - Founding Principal & Chief Executive Officer
Gene Houston -Principal & President
Michael Roddy – Principal & Executive VP of Real Estate Acquisition
Scott Shepard - Vice President, Business Development & Project Management
Michael Gilbert - Director of Business Development & Project Analysis
Maxwell Wyatt – Chief Financial Officer
Ken Kuwahara - Senior Managing Director, Broker
Jeremy Zick - Client Relations
Michael Engeman - Client Relations

620 Newport Center Dr., Ste 1100
Newport Beach, Ca 92660

Tel: (949) 682-2020
Fax: (949) 266-8382

Email: inquiry@mbiinc.org

**Strategic Partners**

Steve McGee - CEO, Unify International Inc.

Copyright 2009 Maximum Business Innovations. All Rights Reserved.

# MAXIMUM BUSINESS INNOVATIONS, INC.

## FOUNDING PRINCIPAL AND CHIEF EXECUTIVE OFFICER

**Kevin McBride** is the Founding Principal and CEO of Maximum Business Innovations, Inc.

Mr. McBride has extensive experience in the capital financial markets having been CEO of the 'The World Group' in Woodland Hills where he oversaw WMG Mortgage, World Property Group, World Realty Group, World Insurance Group, and World Marketing Group. He has previously served as Chief Technical Officer for a company who worked with Google and Akamai developing web based geo-targeting and advanced marketing metrics that are currently used in a multitude of web 2.0 applications and advertising modules. He also currently serves as COO at Exsell an online training company who has training contracts with the Canadian Government, Chevron and Harley Davidson just to name a few, and has been ranked a top 3 LMS in the world by Learning Magazine.

Mr. McBride is on staff at his local church where he manages different campuses during weekend services. Kevin is married, with three daughters, and resides in Corona Del Mar Ca.

Contact Kevin: kevin@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.



PRINCIPAL AND PRESIDENT

**Gene Houston** is a Principal and President of Maximum Business Innovations, Inc.

Mr. Houston has received national accolades in Residential Real Estate Development and Construction. Gene has served on the Board of Directors for the PDCA- Painting Contractors of America and after earning a Bachelors degree from CS Fullerton he served as President for 2 notable construction development firms. Mr. Houston has developed and managed large sales organizations in the energy beverage industry where in 2008 he reached the top 1% money earners in a field of over 1 million sales reps world wide.

Mr. Houston is also a licensed General Contractor in California, and currently owns a design center in Orange County for upscale homes. In the summer of 2009 Gene was awarded a position as one of only 12 senior partners to the HGCS Nobel Peace family green Eco-Village project breaking ground in June 2010 in Washington DC. Gene was instrumental in the vision behind MBI, and is a backbone to its imminent rise. Gene is married with three daughters, and resides in Irvine Ca.

Contact Gene: gene@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.

### PRINCIPLE AND STRATEGIC FINANCIAL PARTNER

**Anton Nel** is the Principle and Strategic Financial Partner of Maximum Business Innovations, Inc.

Mr. Anton Nel started his career in the film industry consulting to the Movie Camera Company in his native South Africa, where he advised on a global marketing structure. He has since assisted various filmmakers in creating structured film finance and tax effective financing models for film and television. He now specialises in packaging, financing and developing theatrical motion pictures and television series for well known networks like Lifetime, ABC, Turner Network, HBO and NBC and has relationships with world-class talent agencies like CAA, ICM, William Morris, etc. and access to distribution networks with the major film studios including Fox, Weinstein Co and Sony, and with smaller independent distributors and international sales companies around the world.

He is CEO Creative Filmed Entertainment LLC and finances approximately 15 films annually under the "CFE" banner. To date in 2009 DP has committed to financing nine TV-movies, three TV series (including the remake of "The Saint") and two feature films. He is also a director of the Global Media Rights Fund, based in Jersey and listed on the Channel Islands Stock Exchange, which invests heavily into film and IP across the globe.

Anton Nel was born and raised in South Africa, attended Stellenbosch University where he studied politics and industrial psychology. Anton currently resides in Long Beach with his wife and 2 kids.

Contact Anton: anton@mblinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.



## PRINCIPAL, EXECUTIVE VICE PRESIDENT OF REAL ESTATE ACQUISITION

**Mike Roddy** is a Principal, Executive Vice President of Real Estate Acquisition for Maximum Business Innovations, Inc.

Mr. Roddy received his Bachelors degree from Cal Baptist University in Riverside where he was a team leader on the CBU Baseball team. After graduating college, Mr. Roddy went on to recieve a California Real Estate Salesperson's License, and decided to open his own real estate company. After years of great success representing millions of dollars in transactions in the Real Estate market, Mike teamed up with MBI and helped grow it to what it is today.

Mike brings his highly influential spirit to all he does, and surely brings irreplaceable value in a variety of areas. Mike is married, and resides in Long Beach Ca.

Contact Mike: mike@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.

## VICE PRESIDENT, BUSINESS DEVELOPMENT AND PROJECT MANAGEMENT



**Scott Shepard** is the VP, Business Development and Project Management of Maximum Business Innovations, Inc.

Mr. Shepard brings wealth of diversity to MBI. A 2000 graduated of California Baptist University, where he also played for the men's baseball team; Scott co-owned and managed his first small business, a private health club in Corona hills during his college days. Scott eventually moved on and received his California Real Estate Salespersons license, spending considerable time in finance, real estate sales, and investments from 2001-2008. Scott has an extensive background in marketing, sales, and leading teams online and off. In his part time since 2001, Scott has been an assistant coach/consultant for the Riverside Community College baseball team, having helped guide the program to 4 California State Championships.

Scott is a consummate leader that is driven by results, and serves an integral role in the foundation of MBI. Scott currently resides in Riverside California with his wife and two kids. His family attends Crossroads Christian Church in Corona.

Contact Scott: scott@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.



### DIRECTOR OF BUSINESS DEVELOPMENT AND PROJECT ANALYSIS

**Michael Gilbert** is the Director of Business Development and Project Analysis of Maximum Business Innovations, Inc.

Mr. Gilbert has forged an award winning career in Real Estate development. Michael has successfully managed architecture and planning duties for multiple single family and multifamily developers as well as developing and directing national contract efforts for a Fortune 100 home builder. He's been directly involved in domestic developments as well as international projects. His rolls have varied; design development, market analysis, project specification development, project management, contract channel development and project analysis have been his focused disciplines in the RE development arena. He infuses his leadership skills, drive and attention to detail into all personal and professional endeavors, while maintaining a team approach that positively affects the end results.

Michael is currently the director of Business Development for REGENERGY™365, a "clean-tech" technology development company; he is also a REGENERGY™365 Board Member. His duties include, investor relations, licensing and manufacturing partnership formation and financial strategy review and implementation. Analytical by nature and diligent by design, Michael brings a keen eye to MBI and a positive supporting approach that keeps the integrity of the company on the forefront. Michael currently resides in Boston, Massachusetts and is a transplant from Southern California.

Contact Mike: mgilbert@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC. 

**CHIEF FINANCIAL OFFICER**

**Maxwell Wyatt** is the CFO of Maximum Business Innovations, Inc.

Mr. Wyatt received a B.S. degree in Engineering from California Polytechnic State University in San Luis Obispo concentrating in Mechanical Engineering. He led the origination department at nation's largest church bond firm by the age of 27. His experience has amassed close to $1 billion in securities instruments underwritten during his tenure.

Currently Mr. Wyatt holds his California Real Estate Broker's License as well an FINRA series 63, 7 and 24 licenses. Maxwell currently resides in Fresno California with his wife and two kids where he is active in his church.

Contact Maxwell: max@mblinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.

**SENIOR MANAGING DIRECTOR/BROKER**

**Ken Kuwabara** is the Sr. Managing Director/Broker of Maximum Business Innovations, Inc.

Mr. Kuwabara is licensed California Real Estate and Mortgage Broker.  Mr. Kuwabara brings a vast wealth of knowledge in Banking and Management having been a former top-level Vice President with Countrywide Home Loans.

Ken is a UCLA graduate in Business Economics, bringing a unique perspective to the team with his international business experience. Having opened several restaurants in and around Southern California, including several in Tokyo Japan, brings a strong logistical and knowledge base value to our team.

Ken is married with one daughter and resides in Torrance Ca.

Contact Ken: ken@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.



**DIRECTOR OF OPERATIONS**

**Jeremy Zick** is the Director of Operations for Maximum Business Innovations, Inc.

Mr. Zick is a valuable asset to the MBI family.  Jeremy has played professional baseball as a pitcher for the last 5 years for the St. Louis Cardinals and the Toronto Blue Jays organizations.  A 2004 alum of Ole Miss, (University of Mississippi) where he was a star for the baseball team, he helped lead the Rebels to a #3 National Ranking and the schools first ever hosting of a Regional Tournament. He also attended Riverside Community College in 2001-2002 where he helped lead the team to 2 State Championships.

Jeremy decided to take his talents to the business world, having spent all his time since leaving the game, while learning the industry under some successful mentors.  Jeremy has been working in finance and sales for the last 3 years.  He is now poised to bring his determination, hard work and strong leadership skills to assist MBI in its growth.  Jeremy resides in Ontario Ca.

Contact Jeremy: jeremy@mbiinc.org

# MAXIMUM BUSINESS INNOVATIONS, INC.



**RESTORATION SPECIALIST**

**Mike Engeman** is the Restoration Specialist for Maximum Business Innovations, Inc.

Mr. Engeman brings a diverse professional background to MBI. He began his professional career working in upper management for a large sporting goods retailer as the youngest Sales Manager in the company.  After serving in that position for 4 years, Mike felt compelled to take on a new challenge with a Christian based, non-profit organization.   He served in various roles within that organization, ultimately filling the role as the Executive Director.  In 2007, Mike and his family moved from Southern Oregon to Southern California, where he oversaw the daily operations of two large construction companies prior to joining an extremely successful group of individuals at MBI.

Mike is married with two children and is currently residing in Irvine, California.

Contact Mike: mengeman@mbiinc.org

000054



# MBI

### A Forward Thinking Group of Professionals

| HOME | ABOUT MBI | MBI TEAM | CLIENT LOGIN |

Monday, April 26, 2010

Tel: (949) 482-2020
Fax: (949) 266-6282
610 Newport Center Drive, Ste 1100
Newport Beach, CA 92660

Email: inquiry@mbiinc.org

## PROJECT FUNDING

MBI has engineered two proprietary programs that offer an exceptional project funding opportunity for select outside groups that have initial equity but are lacking the additional debt or equity to complete or move their project, acquisition or expansion forward. MBI's funding models were birthed by a simple concept of investing into large pools of distressed assets by a sister company. From there the focus was to protect our investors capital through secure methods. Through this process, we married the minds of some very experienced financial executives to form the team at MBI and expand reach into the open market.

MBI has relationships with tier financial and banking institutions, managed funds, hedge funds, funds of funds, private equity, private money, and hard money to help arrange or facilitate your transaction(s).

We have the ability, if needed, to provide sources of equity instruments and credit enhancements, then turn over to provide debt against those instruments.

With our "Flex Funding Program", MBI provide debt on your project using a credit enhancement in the form of an SBLC, BG, or CD (Stand By Letter of Credit, Bank Guarantee, or Certificate of Deposit) as collateral. These instruments can never be drawn on, liened, assessed or otherwise utilized as collateral. The only condition of the instrument is that it be placed with MBI during a pre-determined management period. The length of this management period determines if there will be a note loan due or if the funding will be self-liquidating and non-recourse against the project.

We have also engineered what we call our "Capital Leverage Program." This is a streamlined escrow transaction that requires a equity participation from the client. With the CLP, there is not a project requirement. This program was originally structured for the protection of a film client of ours. It is still utilized in that manner but can now take in outside third party equity partners. The end result was a bullet proof opportunity that anyone could benefit from. Essentially the CLP will provide up to 100% matching funds in escrow as compensation to the equity partner from a private equity group, while taking less than 20 days to close.

Both our funding programs were prepared to protect our own money while we took advantage of all the great opportunities the distressed credit markets had to offer. We have realized that there is a great need for solutions like these in the open market and we have begun to offer them in that fashion.

Contact us today to see if we can arrange financing that meets your needs.

Copyright 2009 Kitahara Business Innovations. All Rights Reserved.

termsofuse                                                                    Page 1 of 2



## TERMS OF USE AND DISCLAIMER

By entering our site, you acknowledge your agreement with an understanding of the following Terms of Use pertaining to this site including all material on it.

**Ownership and Trademarks:**

"MBI" is the trade name for Maximum Business Innovations and its affiliates (collectively, "MBI"). The trademarks, logos and service marks shown on this site are registered trademarks of MBI. Nothing on this site shall be interpreted as granting any license or right to use any image, trademark, logo or service mark on the site. Copying or downloading material from this site does not transfer title of any material on this site to you. Anything transmitted to this site by you becomes the property of MBI and may be used by us for any lawful purpose. MBI reserves all rights with respect to copyright and trademark ownership of all material at this site, and will enforce such rights to the full extent of the law.

**Linked Sites:**

MBI is not responsible for the content of any site linked or linking to this site. Your linking to any off-site pages or other sites is at your own risk.

**No Offers or Reliance:**

No material at this site shall be used or considered as an offer to sell or a solicitation of any offer to buy the securities or services of MBI or any other issuer. Offers can only be made where lawful under, and in compliance with, applicable law.

MBI makes no representations that transactions, products or services discussed on this site are available or appropriate for sale or use in all jurisdictions or by all investors. Those who access this site do so at their own initiative and are responsible for compliance with local laws or regulations.

While MBI uses reasonable efforts to obtain information from reliable sources, MBI makes no representations or warranties as to the accuracy, reliability or completeness of any information or document at this site obtained outside of MBI. Opinions and any other contents at this site are subject to change without notice.

MBI is not utilizing this site to provide investment or other advice, and no information or material at this site is to be deemed a recommendation to buy or sell any securities or is to be relied upon for the purpose of making or communicating investment or other decisions. Any transactions listed on this site are included as representative transactions and are not necessarily reflective of overall performance.

MBI does not advise on the tax consequences of any investment.

**Past Performance:**

Past performance is not indicative of future results; no representation is being made that any investment will or is likely to achieve profits or losses similar to those achieved in the past, or that significant losses will be avoided.

**No Warranty; Limitation on Liability:**

The materials on this site are provided "as is" without warranty of any kind, either express or

termsofuse

implied, to the fullest extent permissible pursuant to applicable law, including but not limited to
the implied warranties of merchantability or fitness for a particular purpose or non-infringement.
MBI further assumes no responsibility for, and makes no warranties that, functions contained at
this site will be uninterrupted or error-free, that defects will be corrected, or that the site or the
server that makes it available will be free of viruses or other harmful components. MBI shall not
be liable for any damages to, viruses that may infect, or services, repairs or corrections that must
be performed on your computer on account of your accessing this site.

Under no circumstances, including, but not limited to, negligence, shall MBI be liable for any
special or consequential damages that result from the access or use of, or the inability to access
or use, the materials on this site, even if MBI has been advised of the possibility of such
damages.

MBI is NOT a United States Securities Dealer or Broker or U.S. Investment Adviser. Sender is
a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction.
All due diligence is the responsibility of the Buyer and Seller and/or Client.

**Equal Employment:**

MBI is committed to the principles of equal employment opportunity and does not discriminate
against any employee or applicant for employment because of race, color, religion, gender,
national origin, veteran status, disability, age, citizenship, marital status, sexual orientation or
because of any other criteria prohibited under controlling federal, state or local law.

Copyright 2009 Maximum Business Innovations. All Rights Reserved.

Name & Address:
Philip J. Layfield (SBN 204836)
Philip J. Layfield, Attorney at Law
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Total Access Payments, Inc., a Delaware Corporation | CASE NUMBER |
| PLAINTIFF(S) | |
| V. | CV 10 5475-GHK-RC |
| Maximum Business Innovations, Inc., a Colorado Corporation, Commercial Escrow Services, Inc., a California Corporation, Eagle Ledge Capital, LLC, a California Limited Liability Company, Dakota Holdings, Inc., a California Corporation, Antoinette Hardstone, an individual, Kevin McBride, an individual, Timothy P. Gates, an individual, Matthew Anderson, an individual, Claudia Lopez, an individual, Maxwell A. Wyatt, an individual, Scott Shepard, an individual, Gene Houston, an individual, Rhett Landon Shepard, an individual, Michael S. Roddy, an individual, and DOES 1-10 INCLUSIVE | **SUMMONS** |
| DEFENDANT(S) | |

TO: DEFENDANT(S) Maximum Business Innovations, Inc., a Colorado Corporation, Commercial Escrow Services, Inc., a California Corporation, Eagle Ledge Capital, LLC, a California Limited Liability Company, Dakota Holdings, Inc., a California Corporation, Antoinette Hardstone, an individual, Kevin McBride, an individual, Timothy P. Gates, an individual, Matthew Anderson, an individual, Claudia Lopez, an individual, Maxwell A. Wyatt, an individual, Scott Shepard, an individual, Gene Houston, an individual, Rhett Landon Shepard, an individual, Michael S. Roddy, an individual, and DOES 1-10 INCLUSIVE

A lawsuit has been filed against you.

Within _____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ ___First___ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Philip J. Layfield, Esq._____, whose address is _100 Wilshire Blvd., Suite 950, Santa Monica, CA 90401 (310) 956-1497_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _9-9-10_____

By: _____ M. _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Philip J. Layfield (SBN 204836)
Philip J. Layfield, Attorney at Law
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Total Access Payments, Inc., a Delaware Corporation | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV 10 5475-GHK-RC |
| V. | |
| Maximum Business Innovations, Inc., a Colorado Corporation, Commercial Escrow Services, Inc., a California Corporation, Eagle Ledge Capital, LLC, a California Limited Liability Company, Dakota Holdings, Inc., a California Corporation, Antoinette Hardstone, an individual, Kevin McBride, an individual, Timothy P. Gates, an individual, Matthew Anderson, an individual, Claudia Lopez, an individual, Maxwell A. Wyatt, an individual, Scott Shepard, an individual, Gene Houston, an individual, Rhett Landon Shepard, an individual, Michael S. Roddy, an individual, and DOES 1-10 INCLUSIVE | SUMMONS |
| DEFENDANT(S) | |

TO:      DEFENDANT(S) Maximum Business Innovations, Inc., a Colorado Corporation, Commercial Escrow Services, Inc., a California Corporation, Eagle Ledge Capital, LLC, a California Limited Liability Company, Dakota Holdings, Inc., a California Corporation, Antoinette Hardstone, an individual, Kevin McBride, an individual, Timothy P. Gates, an individual, Matthew Anderson, an individual, Claudia Lopez, an individual, Maxwell A. Wyatt, an individual, Scott Shepard, an individual, Gene Houston, an individual, Rhett Landon Shepard, an individual, Michael S. Roddy, an individual, and DOES 1-10 INCLUSIVE

A lawsuit has been filed against you.

Within _____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ _____ First _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Philip J. Layfield, Esq. _____, whose address is 100 Wilshire Blvd., Suite 950, Santa Monica, CA 90401 (310) 956-1497 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: 9-9-10

By: **TANYA DURANT**
Deputy Clerk

(Seal of the Court)      1188

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)      SUMMONS